Court is reconvened. You may be seated. Our next case of the afternoon is Cobblestone Estates v. Courtney Joyner et al., 415-0651 for the Appellant, Mr. Myers, and arguing for the Appellee, Mr. Gates. You may proceed. Thank you, Your Honor. May it please the Court, Counsel, I'm John Myers. I'm the representative, the attorney for the Cobblestone Estates Homeowners' Association, which, of course, is a typical homeowners' association with jurisdiction over a large subdivision, about 500 homes, more or less, on the far west side of the field. This case concerns the interpretation of some covenants and how they relate to an agreement that was entered into by the parties in 2007. The 1993 covenants for Cobblestone Estates Association, paragraph 33, said, in essence, that approval of the members of the association would be required for the addition of any new flat to the subdivision after January 1, 2003. In 2007, what happened is the association and the developer, which is the predecessor in interest of Mr. Joyner, entered into this agreement called the Agreement Regarding Future Uses. The Agreement Regarding Future Uses did a number of things. Mainly, it granted approval for the 25th addition. It also put restrictions on such things as what would happen if a flat came in or a use came in that required a conditional permitted use, such as the Lucy's Place gambling operation. The question before the court is, I think, whether this Agreement Regarding Future Uses is void or not. The trial court found it was void. And then the next question is, what is the consequence of its voidness? If, of course, we challenge it being void, we think it's perfectly enforceable. But assuming it is void, then what are the consequences of that? And the homeowners association, of course, contends that if indeed the agreement is void, this means that this flat cannot be added to the subdivision. Mr. Joyner cannot use the ponds that belong to the Association for Detention and Retention of Stormwater. I'm not talking about natural drainage. I'm just talking about stormwater retention and detention. I think the case revolves around, or at least as decided by the trial court, it revolves around a meeting of the homeowners association that was held in December of 2007. The agreement said that this Agreement Regarding Future Uses said that it had to be okayed by the homeowners association. There was a meeting. The meeting did not happen within 30 days, which Mr. Joyner contends in the trial court found was necessary. Mr. Joyner, you said it had to be approved by the homeowners association. Yes. Isn't there a difference between the membership of the association and the association itself? Well, you know, that's an interesting question. If it has to be approved by the membership, which is what that paragraph 33 of the 1993 agreement says, the members, we would contend that that can only have one meaning, that if it's being approved by the members, it's being approved by the association. Otherwise, every time the developer needs to bring in a new plat, you've got to have a vote of 500 people, as Mr. Gates pointed out in his brief, which simply isn't practical. And if there wasn't a vote of 500 people to approve this thing, then Mr. Joyner cannot bring his plat within the subdivision, because there's no approval, and this paragraph 33 requires that there be approval for any new plat after 2003. Now, what does that mean? Do you both agree? I'm sorry. Do you both agree that it's only the association that had to approve it? I thought there was a special meeting held in December of 2007 where the membership voted. Well, it was an association member. It was a meeting of the association. And there, under the bylaws, you have to have a certain number of people there for a quorum. And so the membership, it was an association meeting, but it wasn't like there was a ballot handed out to 500 people. A meeting was called, quorum showed up, there was a vote, it was approved. Does that answer your question? Well, I'm still a little confused, because wasn't it, does this association have a board? It does. Okay. And this was not, I'm sorry. Doesn't the association usually act through its board? It does, but in this case, the agreement regarding future uses required approval of the association, and so there was a special meeting. It required the approval of the association, but it required approval of the membership of the association. Correct. Now, are you two in agreement that it just means the association and not the membership? Well, I would contend that the association is the membership. The membership. Now, you're right. Of course the association acts through its board. If it were just the board that had to approve this thing, that's a no-brainer, because obviously the board was in favor of it or they wouldn't have put it to the vote. Here, the question is, was there a vote of the membership, and according to the minutes, there was, and this thing was approved. Not within 30 days, though. That is correct. It was not approved within 30 days of the approval by the city council of the variance, that is true, or of the plan. That's true. Why would the association put that burden on themselves to get this approved within 30 days? Because that was put in that their own lawyers were doing, wasn't it? Well, I asked them that, and of course that's outside the record, but I didn't really have a response to that. But you took a step, too, didn't you? I did, and he was asked the question, why did you put it in there? And he said there was some opposition. We thought it would make sense to put it to a vote. Well, the answer is because he thought the 1993 covenants required it. Well, that's right. That's correct. Yeah. Right. But he also, the 30-day... It required the 30-day limit? Well... That's what I'm asking about. Let me break this down. No, not the 30-day. Yeah, the attorney, Mr. Turner, he's with Sorley. He thought that the approval was required. He put the 30 days in there to move the process along according to his testimony. Well, we blew the date. I mean, there's just no question. That's an uncontested fact. But then the question is, if you don't make the date, but you still have the meeting and you still have the approval, is the agreement void? And we contend that under the law, especially as enunciated in this Chariot Holdings cases and some other cases, these kinds of drop-dead dates in contracts do not void contracts if they're not met. They do not... If there's substantial compliance with the contract, the fact that they didn't do it within 30 days does not void the approval. It does not void the contract. And here, it's crystal clear that all of the provisions in this agreement regarding future uses were, in fact, performed. The association gave its approval to the variance that was requested. The association took title to the PONS, which was in the agreement regarding future uses. The developer paid the association $26,000. It took a couple of years, but they paid the association. And the association supported this variance of a terminally unmet approach. So the whole thing was performed. And there was never any suggestion that this agreement was void until I filed this case. And Mr. Joyner, through Mr. Gates, filed this motion for summary judgment saying the agreement was void. Was the 2007 agreement ever signed by the parties? Yes, ma'am, it was. It wasn't signed by Mr. Joyner. It was signed by the developer, Giacometti and his group, and it was signed by the association. And it's in the record. There's a bunch of, you know, it's the typical parties exchanged faxed signatures and all that. Mr. Joyner was, A, a third-party beneficiary of it. And secondly, his attorney, Mr. Zirkle, who, of course, is now the city attorney at Springfield, Mr. Zirkle participated in the negotiation of the deal and, in fact, reviewed a copy of this agreement the very day that there was a hearing in front of the city council pertaining to these variances. So we contend, and I think the case law is clear, that Mr. Joyner is bound by the agreement, assuming the agreement is valid, and we contend it is valid. When was the sale to Joyner made? In October. Before or after this agreement was signed? It was after the agreement but before the homeowners association meeting. It was in October. And Mr. Gates will correct me if I'm wrong. I think it was. Counsel, you've mentioned that the cases seem to indicate a provision such as set forth in the first paragraph of paragraph 5 that within 30 days of the city council approval of the board of directors, it will call a special meeting of the membership, et cetera. However, those cases don't have then, as far as I can tell, the final paragraph of number 5. If the membership shall fail to adopt said approval as set forth in this paragraph 5, then this agreement shall be null and void. That is language that tends to suggest that the language at the beginning of number 5 is very important as a part and parcel of this contract. That's what seems to me to be distinguishable from some of the cases you're citing. Also, when you say that there was performance, number 1 was not performed. The developer shall pay the sum of $26,600 to the association. That was performed. Not until after 2010, right? That's right. That's true. There were other intervening factors. There were issues with mud in the ponds and the levels of the ponds. There were engineering issues and all that kind of stuff. And they didn't get around to getting final agreement until 2010. And as Mr. Turner testified, this 2010 agreement was intended as a replacement of the 2007 agreement, which basically brought everything up to date as to what had happened in the interim. Why did you need a 2010 agreement if the 2007 agreement was still in operation? I can only go back to Mr. Turner's testimony. The parties wanted a recordable agreement. They've been talking to the title company. The title company wanted it recordable. So they decided to bring it up to date as to what had happened between 2007 and 2010. Then why did you record the 2007 agreement in 2012? Call it an excess of caution. That's all I can tell you, Your Honor. I think they were both recorded. But I'd like to turn, then, what are the consequences if this contract is not void? If it's not void? Can I ask you to tell me in simple English, why is the 2007 agreement important to your plan? It's important for a number of reasons. First of all, it says that there will be no uses in this subdivision that are inconsistent with the zoning as it existed in 2007. And we contend that these apartment buildings are. And secondly, it says that there will be no uses that require a conditional permitted use permit from the city of Springfield without the association of blessing. And here, Lucy's Place, you've seen the Lucy's Place little gambling places everywhere. Lucy's Place required a conditional permitted use. That's why. And none of that is in the 2010 agreement? Well, it is in the 2010 agreement, yeah. It is. But did Lucy's Place come into effect between 2007 and 2010? No, ma'am. That came in later. Lucy's Place started in 2012. When variances in CPUs were, I'm sorry, CPU was sought to allow the Lucy's Place. But if I may, I'd like to. How would that have been consistent with the 2010 agreement, then? Pardon me? How would that have been consistent with the 2010 agreement? Well, it wouldn't have been. I mean, the point is, if we have, if the association has to approve a conditional permitted use, and the association. So basically, the answer, I think, to Justice Pope's question is it's important to get rid of Lucy's Place, right? And to get rid of that apartment. Well, that's exactly right. In the end, that's what this is about. It's about the apartments, and it's about the gambling operation this close to the residences. Other than that, they wouldn't be paying me all this money to fight this fight. That's the bottom line. But let's talk a minute about, because my time is running short, let's talk a minute about what happens if the agreement is void. If the agreement is void, we have to go back to paragraph 33 of the 1933, I keep saying 1933, the 1993 covenants. Paragraph 33 says that the approval is required of the homeowners in order to, quote, bring a new plant, or I'm paraphrasing, bring a new plant, quote, within the scheme, close quote, of Cobblestone Estates. And what that means, it means a couple of things. It has to do with the name. We're not saying Mr. Joyner can't develop his land. Of course he can develop his land. What we're saying is he can't call it Cobblestone. He can't call it 25th Edition. And most importantly, he can't use the common elements of the subdivision, those mainly being the stormwater detention ponds, for stormwater detention. He needs to build his own. And to me, you know, it's the heads I win, tails you lose argument. What Mr. Joyner is saying is, well, disagreement is void, but we don't have to follow the paragraph 33 of the 1993 covenants. We don't have to follow that. We get to use your stormwater detention. We get to call this Cobblestone. And to heck with what the 1993 covenants say. So, and I think Judge Tobin adopted this heads I win, tails you lose notion, and said on the one hand, the agreement regarding future uses is void. But on the other, refused to recognize the provisions of the covenants that say to bring a new covenant, to bring a new subdivision plant within Cobblestone after 2003 requires the affirmative approval of the members. So what we're asking the court to do, first of all, we think the agreement regarding future uses is valid. But if it's not, we don't see how possibly Mr. Joyner can use the association's ponds, call his development Cobblestone, and otherwise take advantage of the agreement regarding future uses, which allowed him to do all these things. Did the 2010 agreement require membership approval? You know, I don't know that, throw that off the top of my head. I don't think it did. I think it recited. Why would it be different than the 2007 agreement? Why would it be subject to the 1993 section 33 provision? I'm sorry, say that again. Why would it be subject to the 1993 covenants? I'm saying there's a difference between the 2007 agreement and the 2010 with regard to the 1993 covenants. Well, first of all, the 2010 agreement, I believe, recites the fact that the 2007 agreement had been approved. So it was not put to a second vote. And then secondly, if the 2010 agreement is valid, are you asking me if Mr. Joyner can use the subdivision, the ponds and all that? No. I was asking you if the 2007 agreement had to be submitted for membership approval, why wouldn't the same apply to the 2010? I think you answered my question. Yes, the answer is. You're saying because the 2010 agreement incorporated the 2007 and approval had already been made. Right. And as Mr. Turner testified, he said, well, this is just a replacement to recognize all that's happened in the intervening three years. Right. Okay. So in essence, what we're asking this court to do is send it back to Judge Tobin, find that the agreement regarding future uses is not void, and if that would be your holding, then Judge Tobin has to wrestle with the question of whether the apartments are or are not consistent with the uses. We never got that far because of the summary judgment. And also, Judge Tobin has to wrestle with the Lucy's Place. As for counts three and four, the issue there is what kind of relief is appropriate. If it's true that Mr. Joyner cannot use our ponds and has to rename the subdivision, and, of course, he'd be freed from dues if he's not part of the scheme of cobblestone, then there are some mechanical steps that have to be taken, and that obviously is going to take a little time because he's got to build some detention ponds and that sort of thing. So we're asking that this court send it back down to Judge Tobin and have Judge Tobin, with the attorneys, sort all that out. Thank you, counsel. Thank you. Mr. Gates? Thank you. Here's the court, Mr. Myers. This is the rare case to come before you where both sides agree that there are no questions of material fact. We do disagree about a few things, as Justice Pope was asking. We do, perhaps, it sounds like we disagree as to what tasks are assigned to the membership versus what tasks are assigned to the association. I don't think there's any question that those things are different tasks. In the agreement that we're fighting about, the 2007 agreement, they reference the association has various things to do, and then it references the membership of the association has various things to do, very different animals. They, certainly Mr. Turner, the attorney for the Homeless Association back in 2007, understood that his reading of Section 33 of the 1993 Covenants required a vote, as he read it, required a vote of the membership, an entire quorum of 500 people. The quorum is set very low, it's 5%, I believe, so that's 25 people. He recognized that if he reads it the way he read it, he had to get a vote of the membership. Hence, this agreement. We disagree. Our reading of Section 33 of the Covenants, I don't think it requires that the developer obtain all this permission to bring in property. The reason why we believe that is sort of, I guess, global in this whole case. The rights that Mr. Joyner owns as the owner of this piece of real estate, they don't arise only because of these covenants or this agreement. They arise due to a bunch of recorded plats. As I cited in my brief, the Plat Act states that recorded plats function as deeds in fee. The plats were recorded after this tortuous process. The plats were recorded in 1993 as documents in the chain of title. The rights that the 25th edition, this piece of dirt, enjoys starts first from that plat. That plat identifies the whole 281 acres. It doesn't identify just little bits and pieces, it identifies the entire 281 acres. We disagree, and it's not a fundamental part of this case, but we disagree that the developer, again, not my client, the developer needed the permission, but if they did need permission, they needed the permission of the entire membership. That then explains how we get to this 2007 agreement, and it's very clear, at least to me, language regarding why this agreement itself was conditional upon getting permission of the entire association. But they did. The membership did approve it in December of 2007. We disagree. You don't think they voted to approve it? We agree that there was some kind of a vote, but they were never able to prove how many people were there. As I say in my brief, the best that they can show is that 12 people showed up. The membership is 500 people. The quorum is at least 5%. They had a vote. They had a meeting. Maybe there was a vote. The minutes don't reflect it. So they've taken the position that there was a vote. We didn't litigate that terribly hard because, as far as I was concerned, it's moot because it was more than 30 days after the date. Why is that 30 days so immaterial? To me, I'm grappling with the issue of is that 30-day period material when several months later they did it and then everybody acted like it was approved and agreed to? The 30 days was very material to both sides. First of all, let's talk about why it was material to the Homeowners Association. As in the record, there was considerable dissension amongst the 500 members of the Association as to whether or not this deal, the 2007 agreement, was a good deal. In other words, a big chunk of this deal, the biggest chunk of this deal, there's some revisionist history involved here, but the biggest chunk of this deal is Cobblestone Development Company's obligation to pay for upgrades to the pond. That was the main impetus of this. There was much dissension about whether or not the price they were able to get was sufficient based upon the work that needed to be done. The board was very uncomfortable. This is Mr. Turner's testimony. The board was uncomfortable. It wasn't sure that it had the support of the entire membership. To get this done quickly, in other words, to get this agreement signed so that they could proceed with the various plaque recordings and whatnot, there was an agreement or an understanding by Mr. Turner and by the other attorneys, let's get this thing signed, but we all recognize if we don't have the support of the membership, this thing's void. So we put this in here, we keep it moving fast. As Mr. Turner testified, I can't quote it directly, it's in my brief, Mr. Turner testified that the board wanted to keep this moving. These had been negotiations that had been going on for eight or nine months. He wanted this resolved, so he put 30 days in there. Now that's from the association's perspective. From Cobblestone Development's perspective, they had an opportunity to sell a significant chunk of their ground, which, by the way, Cobblestone Development Company still owns big chunks of this 281 acres. They had an opportunity to sell a big chunk of this ground to Mr. Joyner. Mr. Joyner would not buy it unless it was platted ground. He didn't want to mess around with all this surveying and whatnot. He only would buy it if it was platted ground. So they had to get permission from the city, they being the homeowners association and the developers, had to get permission from the city to record this new 25th plaque before Mr. Joyner would buy it. So he, CDC, Cobblestone Development Company, also wanted this to happen fast because they had a buyer, and that buyer was standing there going, I'm not buying it until you get this approved. That buyer is Joyner, right? That buyer is my client, yes. And Joyner also insisted upon a variance, correct?  And he got his variance in accordance with that agreement, which said that the city would cooperate and not object to the variance. And I misspoke. He didn't get it. It was a petition by Cobblestone Development Company, but I'm not going to parse words. To rephrase, the association agreed not to contest the variance and support the granting of the variance. Well, it seems like then your client got some benefits out of this contract, but now doesn't want to accept the entire contract, being the restrictions on the use found later on in the provisions of the agreement. Correct. First of all, it is our contention, and we argued in the trial court, that their lack of objection to the variance was meaningless to Joyner. This is not something that Joyner negotiated. By the way, to make it clear, this contract Joyner was not negotiating. They did find some documents in discovery whereby drafts of it were sent to his lawyer, but there's nothing anywhere in the record that says that either Joyner or his lawyer added anything to this. This was not something that Joyner negotiated or was involved in. That benefit, as we've argued and put into testimony, was nothing. That variance was going to be granted. There was no way the property could be used unless there was a way to get to it by a road. There's no dispute. So that benefit is, to us, meaningless. The only other benefit that we got, because I'm not going to argue that we didn't get something, the benefit that Joyner got was he was able to buy platted ground. But that's not a benefit to him. That's a benefit to Cobblestone Development. They had a piece of ground they couldn't sell until it's platted. They platted it. We said, fine, we'll buy it. So nothing in this agreement was a benefit to Joyner other than CDC was able to clean something up so we could actually buy it and have clean title to it. And I think it's important. This is not something Mr. Myers argued in his opening remarks, but it's important to recognize that, and I think maybe perhaps one of you mentioned it, the timeline here is the City Council approved the 25th edition in September. Joyner bought it the 1st of November. The homeowners' meeting was then not held until another month later. So none of this stuff that Mr. Myers is talking about concerned Joyner in the least. He wanted a piece of platted ground. He bought a piece of platted ground. And importantly, when he bought it and the title work was run, this particular document, which everybody agrees is an encumbrance on real estate, was not recorded. It was not in the chain of title. There is no evidence in the record that Mr. Joyner knew that this document was ever signed, let alone whether it was ever approved. The best they could come up with is that he knew that people were talking about it. But as far as he was concerned, he was paying a significant amount of money for a piece of platted ground, and that platted ground was subject to one thing, and that was whatever was recorded down at the reporter's office, and this document was not recorded. So the issue is not so much... Let's put it this way. Early on in the case... Well, just so I follow what you're saying, you're saying that Joyner wouldn't have purchased it if this agreement had been recorded and it contained the provisions under paragraph 5 being Roman numeral 4 and 6. That's really what you're arguing, correct? Yeah, that's certainly the position we're taking. This is not something that... Mr. Joyner is a developer. He's not buying this to hang on to. He's buying it to do things with it. It is extremely important to him as a buyer to know what he can and cannot do with it. He spends a significant amount of time and money, with me, making sure that the property he buys has no restrictions on it. And if, indeed, someone had told him back in 2007, if you buy this ground, you can't put apartments on it, he would not have bought it. Period. So this document, and I think that the timing of this is... And I don't mean to pew in the Homeowner's Association. They're doing their job. But the timing of this thing, I think, is suspect on the question of whether or not this 30-day requirement, why we needed it. You'll notice that the timing of this is... This document literally died in 2007. No one remembered it existed. In fact, I would suggest to you that when they did the 2010 agreement, everybody knew that the 2007 agreement was dead. They didn't drag this thing out until after we had won and gotten the zoning that we needed. No one cared about this document. They dug it out for that purpose only. There is no question that that 30-days language was central to this agreement and that it was central to the agreement from the position of the Homeowner's Association who wrote it and put it in there in the first place. Moving to the next issue, which is count three, which is the heads I win, tails I lose. What the Homeowner's Association is confused about is they believe that joiners' right to use the drainage and retention ponds arises from this agreement. And therefore, if this agreement is gone, our rights to the ponds are gone. They're just flat wrong. This little, flimsy, four-page agreement has nothing to do with the rights of a many-acre piece of ground to drain into a very complex series of drainage ponds and drainage ditches. You don't create that kind of complexity in something that is hammered out in four pages. Whether or not a joiner is entitled to be part of the Homeowner's Association, a voting member, I don't know. Maybe they're not, if Section 33 meant that they have to have membership approval to become part of the Homeowner's Association. But if they don't want us to call a cobblestone, that's not the issue. The issue is whether we can use these ponds. The right to use the ponds arises from a huge, complicated statutory scheme as well as a very complicated engineering process that was put together back in 1993 and on down through today. They're still doing that kind of work. In the words of Mr. Meyer's original response to my motion for summary judgment, to unscramble the eggs in this process would be virtually impossible. First of all, practically impossible, but also legally impossible. The best example of that is simply this. The only defendants in this case are Corky Joiner, Lucy's Place, and Cobblestone Development. To unscramble the eggs the way they're talking about, you'd have to name seven or eight other owners who bought property in the 25th subdivision. You'd have to include the city of Springfield, which has drainage rights across our property. And as I pointed out in the brief, there's entire parts of the cobblestone estates that drains across the Joiner property and then into the ponds. So it is legally, would be impossible to unwind it. But more importantly, the rights that we have do not derive from this document. You could tear this document up and we'd still have the rights to drain. I don't know, we didn't argue necessarily about whether we have the right to use the name Cobblestone. I don't care. I would suggest to you, and the reason that wasn't argued is, they don't really want us out. This count three and four were thrown out as a better threat than a reality. They're saying, whoa, whoa, whoa, you're going to terminate this agreement. We're going to gain your drainage rights. They don't want us out. We pay a huge amount, we being Corky. I don't pay anything.  The argument is to use the ponds. Now there's an argument that he isn't paying enough. We argue we're paying too much. That's going to get resolved here when you guys are done. But the fact of the matter is, he pays a lot of money to maintain those ponds. They'd love to have that money. They don't want Corky Joiner's 25th subdivision out of, or 25th addition, they don't want it out of the subdivision. They merely wanted to put some pressure on Joiner. They can't do it. This is their rights, the rights to the pond, far predated this 2007 agreement. And it can't be unwound. It's the 25th addition. Does it have the apartment buildings on it? It does. And it has Lucy's place on it. Yeah, the 25th addition currently is improved with two big strip malls. It's improved with offices. It's improved with IHOP. It's improved with a gas station. It's improved with the apartments. So it is a mixed use. That's where this whole thing started. And is all that stuff already built? Yeah, it's all built. So how are they going to get rid of the apartments? Just cut it off from what they want? What are they asking for? To cut off the 25th addition from the subdivision? Yeah. It's impossible. But under the 2010 agreement, it's included in there, isn't it? Exactly. The 2010 agreement, which no one's challenged, it specifically says that the 25th addition is part of Cobblestone Estates. It says additions 2 through 25. That's us. And the strip malls have been built. Lucy's is a tenant. And also importantly, if this thing gets sent back to the court, I'm 100% confident we're going to prevail that apartments are consistent with the uses. We've got high-density duplexes. We've got auto body shops. I don't know what wouldn't be consistent. Maybe a meatpacking house. So we're ultimately going to win that even if this agreement wasn't thrown out. We filed a motion for summary judgment to throw it out because we thought it would be easier. I'm beginning to doubt whether that was a smart move or not. But the key is there is a very mixed use, and we have sold, not just rented, Joyner has sold seven parcels of the 25th addition to other people who bought it not knowing about the existence of the 2007 agreement because it was never reported. Another thing that I think is important to mention, somewhat of an aside, there is a gas station in there, a quick and easy gas station. A quick and easy gas station sells alcohol. It also got a conditional permitted use, which would be technically in violation of the 2007 agreement. And the Homeowners Association never said a word. It never came up. They never brought it up. Again, showing to us that no one thought the 2007 agreement was enforceable. If it was, they could have brought it up and raised the issue regarding a CPU when we brought in the quick and easy. There was a provision in the 1993 covenants where the association retained power over use of the retention ponds, correct? Well, at the time, no, because the ponds belonged to the developer. Up until 2011, the ponds belonged to the developer. He was to manage them. There was a structure put in place that said at some point in time, the developer can deed the ponds to the Homeowners Association. So that's what this is all about. Okay, well, what is in the trial court's order, the second one that's stated July 17, 2015, it says none of the applicable covenants provides the HOA with the power to suspend use of the detention retention ponds. And he's talking about, I think, the 2008 covenants. That provision in the 1993 covenants was never incorporated in with the 2008 covenants. Right. What does the trial court mean there? I understood that to mean that when the 2008 covenants were recorded, it was very specific as to what part of the 1993 covenants were to be included in the 2008s. And that was not one of them. That is the provision regarding the retention detention ponds. The provision that he's referencing right there is the part that's in count 4, which says their argument is if you don't pay your assessments, we can shut you off. That particular provision didn't make it into the 2008 covenants, which means that particular provision does not apply to the 25th edition. That was an easy one. That was a throwaway. Thank you, counsel. Well, I wish I had 15 minutes to respond, but I only have five, so I'll talk fast. First of all, Justice Pope, I think, asked the question, have these things been built? And the answer is some of them have been built. But what happened is Mr. Joyner, as long as we're talking about stuff that's off the record or wasn't in the trial court record, Mr. Joyner went in front of the city council of Springfield and asked permission, asked for a rezoning so he could build his apartment building. I objected, and part of the reason I objected was the 2007 agreement. So Mr. Joyner, yes, he's built three apartment buildings thus far, but he proceeded at his own risk. And we all know when you proceed, if there's litigation going on and you proceed anyway, it's at your risk. So the fact that there's a couple apartment buildings out there, I'm sorry. He made a considered judgment. He was in the torpedoes full speed ahead. Does that apply to subsequent purchasers as well? Well, there are people who've rented. No, he owns the apartment building. So he's renting it to tenants. As of right now? Yes, sir. That's correct. That's right. This business about Joyner wouldn't have purchased the property had this agreement been in the chain of title, well, that's sheer speculation. That's lawyer talk. I mean, the fact of the matter is his attorney knew all about this agreement. And to say, Mr. Zirkle, we all know Mr. Zirkle. I've known him longer than some of you. And you can be sure that Mr. Zirkle informed Mr. Joyner that this thing was out there. And even if he didn't, it's constructive notice. So that whole business about I wouldn't have done this, I wouldn't have done that, it's sheer speculation and, again, outside the record. But the most important thing I want to correct is this issue of the right to use these ponds. If you look in Mr. Joyner's brief, you will not find a single case that says he has the right to use off-site detention and retention areas for his stormwater and that such a right derives from the acts of the City Council of Springfield or the drainage code. Now, we all know that under the Platt Act, and when subdivisions are built, if you affect the drainage, and you're going to if you're turning cornfields into parking lots, you have to provide for on-site detention unless you have an easement from a third party. And I've done lots of those easements in my now 35 years at the bar. I've done these easements for off-site detentions. There's no such easement here, and the City Council of Springfield cannot create a property right where none exists. And consequently, and I've cited the cases in the brief, for Mr. Joyner to put his stormwater flows into our ponds is trespass. But I want to make it clear, we're not saying that because his water can't flow into our ponds, because that's the natural drainage course, and I've cited the drainage law, what we're saying is that the stormwater drainage must be subject to on-site detention by Mr. Joyner. That's all I'm saying. And there's no, nothing in his brief or in the law says that he has a right to off-site detention in the absence of an easement. Explain to me what the natural flow drainage versus the stormwater drainage. I'm confused as to the difference. No, no, it's an important question. The water flows, obviously, downhill. Let me start with that. And when there's a, so if Mr. Joyner's land is a higher elevation than the association's land, all those houses, he has a right to drain his land. But what the drainage code, or excuse me, what the Plant Act says, and what the case law says is if I have a 30-acre cornfield, which is what this was, and I cover it over with roofs and parking lots, now what I've done is I have significantly accelerated the rate of discharge. It's not to say that I can't, I can, I have a right to have my water flow on your land, but I can't have it flow on your land at a rate higher than the pre-development rate. And that's exactly, it's in the Plant Act. The Plant Act says when you do this, you've got to have an engineer's certificate that says the water's not going to flow off the land at a higher rate than pre-development. Okay? So every subdivision code of which I'm aware, short of a town of 300, they all provide for on-site detention and retention of storm flows consistent with the Plant Act. And if you walk around all these subdivisions, anywhere in central Illinois, you see these ponds and all the geese hanging around the ponds? Most of those are stormwater retention and detention ponds. They're not there because they're pretty and people like geese. It's actually a waste of the developer's land to have to devote to that. But they're there to detain or retain stormwater. And so all we're saying is his water can flow across our land, just not at a rate higher than the pre-development rate. He's got to detain or retain on-site unless he has any. And I see the lights up. Does that mean I'm out of time? I can't talk another 10 minutes? We'll take the matter under advice. Thank you, Your Honor. We're going to ask for amicus from the geese. Yes.